UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JASON CALL,

          Plaintiff,

   v.

SA MATT BADGLEY, et al.,

          Defendants.

Case No.15-cv-03353-HSG

**AMENDED ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT IN PART AND REMANDING REMAINING STATE LAW CLAIMS**

Re: Dkt. Nos. 77, 94, 106

      Plaintiff Jason Call brings this action under 42 U.S.C. § 1983 and California law against Humboldt County and individual officers employed by the State of California, Humboldt County, and the City of Eureka (collectively, "Defendants"), following the execution of a search warrant at his home.[1]  Pending before this Court are two motions for summary judgment filed by the State of California defendants, Dkt. No. 77, and the Humboldt County and City of Eureka defendants, Dkt. No. 94.  For the reasons articulated below, the motions are GRANTED IN PART.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining causes of action, all of which arise under state law, so those causes of action are REMANDED to Humboldt County Superior Court, case no. DR150282.[2]

---

[1] Plaintiff also named the Humboldt County Sheriff's Office as a defendant, but Plaintiff does not contest that the Sheriff's Office is a subdivision of Humboldt County, already a named defendant in this case.  *Cf. Nelson v. Cty. of Sacramento*, 926 F. Supp. 2d 1159, 1170 (E.D. Cal. 2013) (finding that municipal subdivisions are not "persons" for purposes of 42 U.S.C. § 1983).

[2] This amended order clarifies that the remaining state law claims are remanded to state court rather than dismissed without prejudice.

## I.  BACKGROUND

### A.  Factual Background

The relevant facts giving rise to this lawsuit are generally undisputed, except where indicated below.

#### 1.  Obtaining Search Warrant

In 2011, State Defendant Nelsen of the California Department of Justice was investigating non-party Ryan Hutson as a suspected marijuana broker between cultivators and wholesale suppliers. Dkt. No. 77-3 ¶¶ 12–13. At the time, Nelsen was the Commander of the North State Marijuana Investigation. *Id.* ¶ 5. During the investigation, Nelsen saw Hutson park her car at Plaintiff's house at Bayside Cutoff in March 2011. Dkt. No. 77-4 at BNE-0071. Someone then walked toward Plaintiff's residence with a duffel bag. *Id.* Hutson was seen closing the trunk of her car and leaving Plaintiff's residence soon after. *Id.* Twenty-five minutes later another officer observed her at a different residence at Stanford Circle; she talked on her cell phone, retrieved a brown paper shopping bag from her trunk, and carried it close to her body as she entered another residence. *Id.* Nelsen further claimed that he drove by Plaintiff's house on at least three occasions and smelled the odor of marijuana. *Id.* at BNE-0072. Plaintiff, however, posits that the house is situated too far back from the street for Nelsen to have smelled marijuana. *See* Dkt. No. 83 at 15.

In October 2011, the Drug Enforcement Administration submitted administrative subpoenas for the PG&E records for locations linked with Hutson during the officers' surveillance of her, including Plaintiff's residence at Bayside Cutoff and Stanford Circle. Dkt. No. 77-4 at BNE-0073–74. The PG&E records from mid-August to mid-October 2011 for Stanford Circle and Westgate suggested high usage consistent with indoor growing operations. *Id.* at BNE-0074. The records for Plaintiff's residence suggested slightly higher-than-normal usage, but were not solely indicative of an indoor growing operation. *Id.* In December 2011, Nelsen obtained a search warrant for additional PG&E records for Plaintiff's residence from 2009 through the date of the warrant. *Id.* at BNE-0078. Over these 24 months, power usage was consistent with indoor marijuana cultivation. *Id.* Usage for other locations associated with Hutson was similarly high. *Id.* at BNE-0078–79. In December 2011, a confidential informant told Nelsen that Hutson was

2

still "very active in the sales of marijuana" and had higher prices than other marijuana brokers. *Id.* at BNE-0080. In January 2012, Nelsen learned from the Employment Development Department that several of the individuals linked to Hutson in the investigation, including Plaintiff, did not have any records of employment, state disability, or unemployment payments from January 2010 through September 2011. *Id.* at BNE-0081.

Nelsen then prepared a search warrant application for several locations, including Plaintiff's residence. In the application, Nelsen specifically acknowledged the age of the information, stating that it was his belief that the warrant would still "provide evidence of the events reported in this affidavit *despite the lapse of time between the events described and the anticipated search . . . .*" *Id.* at BNE-0088 (emphasis added). On the basis of this information, Humboldt County Superior Court Judge Timothy Cissna issued a search warrant on January 12, 2012. *Id.* at BNE-0096. The warrant permitted a search of, *inter alia*, Plaintiff's residence, cars, and person. *Id.* at BNE-0097–99. The warrant further permitted the search for and seizure of marijuana, cultivation aids and equipment, containers in which any of those items could be found, indicia of the sales of trafficking of marijuana, including ledgers and receipts, firearms, financial documentation, computers, telephones, wiring, and U.S. currency. *Id.* at BNE-100–103.

### 2. Executing Search Warrant

Members of the Humboldt County Sheriff's Office, Humboldt County Drug Task Force, and the California Department of Justice, Bureau of Narcotics Enforcement Task Force, attended a pre-search briefing conducted by Nelsen. *See, e.g.*, Dkt. No. 77-3 ¶ 17. Nelsen explained the nature of the investigation, the substance of the probable cause supporting the search warrant, the scope of the search warrant, as well as everyone's respective assignments. *Id.*; *see also* Dkt. No. 77-2, Ex. B at 147–49.

On the morning of January 19, 2012, Plaintiff woke to banging on his front door. Dkt. No. 84 ¶ 14. Someone said "search warrant, open the door." *Id.* ¶ 16. After Plaintiff opened the door and asked why the officers were there, an officer "shoulder bunt[ed]" Plaintiff. Dkt. No. 84 ¶ 18. Plaintiff explained that his front door opens outward and the officer hit him on his right shoulder and "shoved past him" to get inside. Dkt. No. 77-2, Ex. A at 91. He did not seek medical

attention or sustain any injuries as a result. *Id.* at 93.

In response to Plaintiff's repeated questions about why the officers were there, another officer pointed a gun at Plaintiff's stomach and said that was "top secret information." Dkt. No. 84 ¶ 20. Humboldt County Sheriff's Department Lieutenant Hanson then handcuffed Plaintiff with his hands behind his back and ordered Plaintiff to sit down. Dkt. No. 94-7 ¶ 4; Dkt. No. 84 ¶¶ 21, 24. While Plaintiff was handcuffed and attempting to comply, another officer pointed a gun at Plaintiff's chest. Dkt. No. 84 ¶ 24. Plaintiff sat down immediately in response, with his back against the wall. *Id.* ¶¶ 24–25.

Directly to Plaintiff's left was a glass door to the room of one of his roommates. Dkt. No. 84 ¶ 25. Several officers told Plaintiff's roommate, who was standing behind the glass door, to open the door. Dkt. No. 77-16 ¶ 4. He did not immediately comply. *Id.* The officers did not know if he was armed or alone. *Id.* At least one other officer, California Department of Justice Special Agent Cervelli,[3] was concerned that he might be arming himself. *Id.* Another officer, Humboldt County Deputy Sheriff Mendes,[4] found a nearby skateboard and broke the glass door. *Id.* Glass from the door hit Plaintiff, who was still sitting next to the door. Dkt. No. 84 ¶ 26. Plaintiff noticed a cut on his foot that he believes is from the glass. *Id.* After securing Plaintiff's roommate, the officers took them both to the living room, where a third occupant was already being detained. *Id.* ¶¶ 26–28. Hanson watched over the three during the duration of the search. *Id.* ¶ 28.

The officers searched the house and found 78 marijuana plants, a triple beam scale, individually packaged marijuana, prescription pills, and multiple firearms. Dkt. No. 77-6 ¶ 16. According to Plaintiff, his entire house had been ransacked by the officers: some had urinated all over his bathroom, tracked broken glass throughout the house, and left the contents of drawers, closets, and cabinets all over the house; officers also left disposable gloves inside Plaintiff's house

---

[3] On March 23, 2017, the Court granted the parties' stipulation to dismiss with prejudice the claims against California Department of Justice Special Agents Cervelli, Helman, Letendre, and Maki. *See* Dkt. No. 91.
[4] On March 23, 2017, the parties filed a notice that Plaintiff had reached a settlement with Mendes. *See* Dkt. No. 93.

and outside in his yard.  Dkt. No. 84 ¶ 38.

At some point following the discovery of the marijuana plants, California Department of Justice Special Agent Badgley entered the living room and asked Plaintiff for the combination to the safe in his bedroom.  *Id.* ¶ 29.  Plaintiff said he wanted a lawyer.  *Id.*  According to Plaintiff, at this point Badgley told him that he was under arrest for violations of Health and Safety Code §§ 11358, 111359, and 11350.  Dkt. No. 77-6 ¶ 16–18; Dkt. No. 84 ¶ 29.  Plaintiff had told Badgley and Hanson, however, that the marijuana was legal because his doctor had prescribed the use of medical cannabis and had issued him an Informed Medical Consent & Verification ("IMCV") under California's Compassionate Use Act of 1996 ("CUA"), permitting the cultivation and possession of marijuana.  Dkt. No. 84 ¶¶ 5–6, 13, 30–32.  Plaintiff's IMCV was also posted in several locations in his home, including on the wooden frame that contained the growing marijuana plants.  *Id.* ¶¶ 10–11.  It states that Plaintiff can possess up to 99 mature plants and 19 pounds of cannabis for his personal use.  *See* Dkt. No. 84-1.  Plaintiff only later heard the sound of his safe being opened.  Dkt. No. 84 ¶ 29.  In it, the officers found prescription pills that Plaintiff admitted were not prescribed to him.  Dkt. No. 77-6 ¶ 16; Dkt. No. 77-2, Ex. A at 145–46.

All the seized evidence, except for the marijuana plants, was transported to the Redding Bureau of Narcotics Enforcement evidence vault.  Dkt. No. 77-6 ¶ 19.  Separately, non-party Humboldt County Deputy Sheriff Todd Fulton seized the plants themselves, retained samples as evidence, and marked the rest to be destroyed.  *Id.* ¶ 20.

Following the search of Plaintiff's house, Hanson prepared an Information Bulletin for the Humboldt County Sheriff's Department that said officers had "located a commercial indoor marijuana growing operation" at Plaintiff's address and had arrested Plaintiff "for cultivation and possession for sales of marijuana."  Dkt. No. 94-8, Ex. B (Humboldt County Sheriff's Office Information Bulletin); *see also* Dkt. No. 84 ¶ 45; Dkt. No. 94-7 ¶ 6.  The bulletin was disseminated to the media, broadcast over radio and television, and made available online.  Dkt. No. 84 ¶ 45.

### B.    Procedural Posture

In February 2015, the Humboldt Superior Court quashed the search warrants, finding that

they were based on stale information. Dkt. No. 86-1. The court stated that the smell of marijuana, the "critical" factor in the magistrate judge's finding, was detected eight months prior to the issuance of the first PG&E warrant and more than nine months prior to the execution of the search warrant at issue here. *Id.*

On June 1, 2015, Plaintiff brought this action in Humboldt County Superior Court against California State police officers Badgley and Nelsen (collectively, "State Defendants"); Humboldt County and Humboldt County sheriff and deputy sheriffs Downey, Hanson, Kirkpatrick, Massaro, Musson, and Quennell (collectively, "County Defendants"); and City of Eureka police officer Harkness ("City Defendant"). On July 21, 2015, Defendant Badgley removed the action to federal court. Dkt. No. 1 at 6.

## II.     LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the Court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If the Court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

With respect to summary judgment procedure, the moving party always bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving

party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment," because the Court's duty is not to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, the Court must enter summary judgment in favor of the movant. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

The Court first addresses the application of qualified immunity to the federal claims against Defendants and then addresses Plaintiff's state law claims.

### A. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). The doctrine thus intends to take into account the real–world demands on officials such as police officers in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). "The purpose of this doctrine is to recognize that holding

officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 243.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City & Cty. of San Francisco, Calif. v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1774 (2015) (quotation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted).

In order to determine whether a triable issue of fact exists as to whether the individual Defendants are entitled to qualified immunity, the Court thus considers the state of the law at the time of the alleged violation, as well as the information possessed by the officers at the time of the search and the officers' actions viewed in the light most favorable to Plaintiff. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

### 1. Unreasonable Search

#### a. Obtaining Search Warrant

Plaintiff's Second Cause of Action alleges that Nelsen willfully obtained the search warrant without probable cause. Plaintiff argues that Nelsen lied to the magistrate judge in his warrant application and that he otherwise lacked probable cause to support the warrant. The Court addresses each in turn.

### i.      Judicial Deception

Plaintiff accuses Nelsen of lying about smelling marijuana near Plaintiff's house and of relying on stale information in obtaining the warrant.

Where, as here, Plaintiff accuses an officer of deliberately misrepresenting information in the warrant application and the officer claims qualified immunity at the summary judgment stage, Plaintiff must:  (1) make a substantial showing that the warrant application contained a false statement or omission that was deliberately false or made with reckless disregard for the truth; and (2) establish that if the false or misleading material is excised, the information provided to the magistrate judge would be insufficient to establish probable cause.  *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), *as amended* (Oct. 9, 1997) (citing *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995)).  Whether the statements were deliberately false is ultimately a fact issue for the jury, but the Plaintiff must first make a "substantial showing" on this issue to survive summary judgment.  *See Liston*, 120 F.3d at 974.

The Court finds that Plaintiff has failed to make a substantial showing that Nelsen acted deliberately or with reckless disregard for the truth in preparing the warrant application.  As part of the application, Nelsen stated that he drove by Plaintiff's house on three separate occasions and smelled the odor of growing marijuana.  Dkt. No. 77-4 at BNE-0072.  In claiming Nelsen lied about this, Plaintiff's only support is the distance from the street to Plaintiff's house.  Plaintiff proffers several Google Maps photographs of his house and the surrounding area.[5]  *See* Dkt. No. 86-2.  These photographs, without more, fall far short of the "substantial showing" necessary to withstand qualified immunity.  There is no evidence in the record describing where Nelsen was when he smelled marijuana at Plaintiff's house.  Nelsen's affidavit does not specify where he was, and Plaintiff did not take Nelsen's deposition to find out.[6]  Even assuming Nelsen was in his car

---

[5] Defendants do not challenge Plaintiff's request for judicial notice, Dkt. No. 86, which includes these Google Maps photographs, the Humboldt Superior Court's order quashing the search warrant, and the California Attorney General's 2008 Guidelines for the Security and Non–Diversion of Marijuana Grown for Medical Use.  Because neither party objects to the court taking judicial notice of the existence of these documents, the Court GRANTS the requests for judicial notice.  *See* Fed. R. Evid. 201(b).

[6] At the hearing on these motions, held on April 27, 2017, Plaintiff's counsel defended the dearth of evidence in this case by suggesting that she did not have enough time for discovery.  Not only

on the street rather than on Plaintiff's driveway, the Google Maps photographs show that the street is only approximately 40 feet from Plaintiff's house. Plaintiff fails to offer any support for his bare allegation that a trained officer could not detect marijuana from this distance.

Plaintiff's suggestion that Nelsen misled the magistrate judge by providing stale information is similarly unavailing. Nelsen explicitly acknowledged the age of the information in the warrant application, stating that he thought the warrant would nonetheless "provide evidence of the events reported in this affidavit *despite the lapse of time between the events described and the anticipated search . . . .*" Dkt. No. 77-4 at BNE-0088 (emphasis added). In December 2011 a confidential informant told Nelsen that "Hutson was still very active in the sales of marijuana." *Id.* at BNE-0080. And in January 2012, Nelsen learned that neither Hutson nor Plaintiff had any records of employment, state disability, or unemployment payments from January 2010 through September 2011. *Id.* at BNE-0081.

There is no evidence in the record that makes the required "substantial showing" that Nelsen deliberately lied or acted in reckless disregard of the truth in preparing the warrant application.

### ii. Probable Cause

Plaintiff further argues that Nelsen lacked probable cause to support the warrant. A search warrant that is not issued "upon probable cause" is invalid. U.S. Const. amend. IV. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The Supreme Court has found that "[w]here the alleged . . . violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). "It is the magistrate's responsibility to

---

did Plaintiff's counsel stipulate to the case schedule and have several months for discovery, but she also never asked to extend the discovery cut-off date. Regardless, this *post hoc* rationalization does not alter Plaintiff's burden to identify with particularity the evidence that precludes summary judgment in light of Defendants' evidence to the contrary. *See Keenan*, 91 F.3d at 1279; *Celotex*, 477 U.S. at 323.

United States District Court
Northern District of California

determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* at 547 (quotation omitted). Nevertheless, there is a narrow exception where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 349 (1986)).

The Court finds that this narrow exception does not apply here. Nelsen detailed the basis for finding probable cause to search Plaintiff's residence: Nelsen observed Hutson firsthand at Plaintiff's residence in March 2011 and saw someone with a duffel bag walk toward Plaintiff's residence. Dkt. No. 77-4 at BNE-0071. He observed Hutson depart Plaintiff's residence shortly after, at which point another officer saw her carrying a large shopping bag close to her person at another location — Stanford Circle. *Id.* Nelsen also pointed out Hutson's frequent travel to other locations with PG&E records that suggested high usage. *Id.* at BNE-0069–82. The records for Plaintiff's residence and Stanford Circle were consistent with indoor marijuana cultivation. *Id.* at BNE-0073–74, 78–79. As discussed above, Nelsen said he smelled growing marijuana at Plaintiff's residence on three separate occasions in 2011. *Id.* at BNE-0074. Nelsen also learned that Plaintiff, as well as Hutson and those affiliated with her in the investigation, also had no reported income from January 2010 through September 2011. *Id.* at BNE-0081.

Plaintiff challenges the finding of probable cause in two ways.

First, Plaintiff cites *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), claiming that Plaintiff's "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." In *Ybarra*, however, the officers only had a search warrant to search the tavern in which Ybarra happened to be sitting. Here, in contrast, Defendants identified facts that indicated at least a fair probability that Plaintiff, and not just Hutson, was connected with an illegal marijuana distribution operation. Nelsen knew about Plaintiff's PG&E records and his lack of verifiable wages and had also smelled marijuana at Plaintiff's house on three separate occasions.

Second, Plaintiff points out that these facts were dated and in some cases, from eight months before the magistrate judge issued the search warrant. Yet this does not render Nelsen's

belief that there was probable cause unreasonable.  Nelsen specifically disclosed the time lapse to the magistrate judge.  And staleness is not binary; rather, it must be evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought."  *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (quotation omitted).  "[W]hen a police investigation relates to a continuing criminal business . . . courts will permit greater lapses of time between the dates of the activities described in the affidavit and the date of the warrant request."  *United States v. Fisher*, 137 F.3d 1158, 1164 (9th Cir. 1998); *see also United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983) (finding evidence of drug transactions that occurred 15 months before search warrant issued not stale where evidence also linked the defendant to drug sale that happened 12 months later).  Some time lapse may be acceptable because "criminal entrepreneurs, much like their legitimate counterparts, likely will retain the equipment and capital of their enterprise for a long period of time.  Thus, evidence of a criminal business operating at a particular location in the not-so-distant past may reasonably give rise to a belief that a search of the location would yield further evidence."  *Fisher*, 137 F.3d at 1164.  In light of the ongoing investigation into Hutson, it would not have been "entirely unreasonable" for an officer to believe, in the particular circumstances of this case, that there was probable cause to search Plaintiff's residence for evidence of marijuana distribution.  The Court accordingly GRANTS Defendants' motion for summary judgment on Plaintiff's Second Cause of Action.

### b.     Executing Search Warrant

In his Third Cause of Action, Plaintiff also brings a § 1983 claim against many of the officers who were present during the execution of the search warrant:  Special Agent Badgley, Lieutenant Hanson, Deputy Sheriffs Kirkpatrick, Massaro, Musson, and Quennell, and Eureka Police Department Sargent Harkness.  To establish a Fourth Amendment violation by these Defendants, Plaintiff must show that they (1) unreasonably relied on the search warrant to conduct the search of Plaintiff's residence and (2) that no reasonable officer, confronting the same circumstances and with the same information, would have executed the warrant the same way.  *See Saucier*, 533 U.S. at 202.

### i.    Reliance on Search Warrant

Plaintiff's Third Cause of Action, like his Second, alleges that the search warrant was not supported by probable cause such these Defendants were unreasonable in relying on it. Yet as discussed above, officers are entitled to rely on a search warrant, provided it is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Malley*, 475 U.S. at 349. Here, Nelsen conducted a pre-search briefing with the Defendants who executed the search warrant. *See* Dkt. No. 77-3 ¶ 17. Nelsen explained the nature of the investigation, the substance of the probable cause supporting the search warrant, the scope of the search warrant, as well as everyone's respective assignments. *Id.* As discussed above, the officers could reasonably believe there was probable cause supporting the search warrant issued by a detached and neutral magistrate.

### ii.    Conduct during Search

Plaintiff further argues that Defendants executed the search warrant unreasonably, in violation of his Fourth Amendment rights. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 565 U.S. at 546 (quotation omitted).

Aside from actually searching Plaintiff's residence within the scope of the search warrant, Plaintiff complains that Defendants left him temporarily on the floor near the glass door, tracked broken glass through the house, left disposable gloves behind, and urinated all over the bathroom. After examining the facts and circumstances of this case, the Court concludes that the manner in which the officers conducted the search did not render it unreasonable.

Plaintiff first claims that it was unreasonably dangerous for Defendants to handcuff Plaintiff and sit him near the internal glass door with no shoes or shirt during the execution of the search warrant. Plaintiff claims that at worst he could have been in the middle of a "gun battle" if Plaintiff's roommate and the officers started shooting. And at best, he could have been — and was — hit by shards of glass from the broken glass door.

"[O]fficers executing a search warrant for contraband have the authority 'to detain the

13

occupants of the premises while a proper search is conducted.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). They may do so "[as] long as the officer conducts the detention in a reasonable manner." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006).

Here, the following facts are undisputed. The officers searched Plaintiff's residence for marijuana pursuant to a warrant with the knowledge that Plaintiff possessed weapons. *See* Dkt. No. 77-4 at BNE-0073. Plaintiff was detained in handcuffs during the search and was initially told to sit down in the hallway before the officers moved him to the living room. *See* Dkt. No. 84 ¶¶ 21, 24–25, 27–28. At the time, Plaintiff was sitting near the glass door to his roommate's room and did not have on shoes or a shirt. *Id.* ¶¶ 15, 25. Several officers told Plaintiff's roommate, who was standing behind the glass door, to open the door. Dkt. No. 77-16 ¶ 4. He did not comply. *Id.* At least one officer was concerned that the roommate was arming himself. *Id.* Another officer broke the glass door to gain access and detain the roommate. *Id.* Glass from the door hit Plaintiff, who was still sitting next to the door. Dkt. No. 84 ¶ 26. Once the officers had detained the roommate, an officer brought both Plaintiff and his roommate to the living room where a third occupant had already been detained. Dkt. No. 84 ¶¶ 25–28.

The Court concludes that the officers' use of handcuffs and their delay in moving Plaintiff was reasonable because the officers had an interest in preventing Plaintiff's flight, in preventing any efforts to conceal or destroy evidence, and also in minimizing the risk of harm to themselves while they secured the other occupants in the residence. *Muehler*, 544 U.S. at 99–100; *Summers*, 452 U.S. at 702–03 (noting that the execution of a warrant to search for drugs "may give rise to sudden violence or frantic efforts to conceal or destroy evidence"). There is no evidence in the record detailing the amount of time the officers had between entering the residence, breaking the glass door, and moving Plaintiff and his roommate to the living room. Still, even accepting Plaintiff's theory of events, the officers had not detained Plaintiff's roommate at the time Plaintiff was told to sit down, and he was moved to the living room once the officers had secured the roommate. *See* Dkt. No. 84 ¶¶ 25–28. The Court cannot find on the basis of this record that the officers acted unreasonably in first securing the house and its occupants before moving Plaintiff to

the living room. *See Sheehan*, 135 S. Ct. at 1777 ("Courts must not judge officers with the 20/20 vision of hindsight.") (quotation omitted); *see also Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 615 (2007) (reversing denial of summary judgment where officers in executing search warrant did not let occupants dress immediately because they needed time to secure house and occupants).

Plaintiff further challenges the general disarray in which the officers left his house following the search, including removing items from drawers and cabinets, breaking at least one door, and leaving glass and disposable gloves behind. The Supreme Court has specifically acknowledged that officers executing a search warrant occasionally "must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). "[O]nly unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment." *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000) (quotation omitted).

Plaintiff offers no legal authority that failing to clean up after the search retroactively renders the search constitutionally unreasonable. Moreover, breaking the glass door in Plaintiff's house was not "unnecessarily destructive." As already discussed, Mendes broke the door when Plaintiff's roommate, standing on the other side of it, failed to open it when asked by the officers. *See* Dkt. No. 84 ¶ 26. Not only did the search warrant permit the officers to search the other side of that door, BNE-0096–105, but breaking the door was also reasonable in light of safety concerns. Plaintiff had two pistols registered to him, Dkt. No. 77-4 at BNE-0073, and the officers did not know whether the roommate was armed. Dkt. No. 77-16 ¶ 4.

Lastly, Plaintiff points to his claim that the officers urinated all over his bathroom during the search. Even if this created a constitutional violation, Plaintiff critically fails to provide any evidence that Defendants actually engaged in this behavior: Plaintiff offers nothing more than their mere presence at his residence during the search and his observation that when he returned home there was urine in his bathroom. Dkt. No. 84 ¶ 38. Plaintiff's roommate also noticed urine all over the bathroom when Hanson escorted him there during the search. Dkt. No. 83-1 ¶¶ 26–28. Plaintiff cannot sustain a group liability theory. "An officer's liability under section 1983 is

United States District Court
Northern District of California

predicated on his 'integral participation' in the alleged violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). The Ninth Circuit has only permitted claims to go to a jury in limited circumstances where the plaintiff does not specifically identify the responsible defendant officers. For example, in *Rutherford v. City of Berkeley*, the plaintiff did not know which of several officers kicked or punched him. 780 F.2d 1444, 1448 (9th Cir. 1986). Yet the Court held that a jury could reasonably infer that the defendant officers punched and kicked the plaintiff in light of evidence that the defendant officers were among those who detained, arrested, and handcuffed the plaintiff and the plaintiff saw the defendant officers surrounding him while he was beaten. *Id.*

Here, in contrast, there is no evidence in the record about which of the several officers may be responsible. Nor is there evidence about each officer's responsibility during the search such as the rooms each officer searched. The only evidence in the record is that Hanson escorted one of Plaintiff's roommates to the bathroom. *See* Dkt. No. 83-1 ¶¶ 26–28. Yet according to the roommate's account, there was already urine all over the bathroom by the time he and Hanson got there. *Cf. Lolli v. Cty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (upholding denial of summary judgment because the plaintiff did "more than simply place the officers at the scene of the altercation and assert a group liability theory" with officer admissions that they exerted some physical force on him); *Jones v. Williams*, 297 F.3d 930, 936–37 (9th Cir. 2002) (rejecting jury instruction that would "hold[] individual officers who were merely present at the search liable" for misconduct, including allegedly urinating in the plaintiff's iron). And even if Plaintiff had adequately identified Defendants, he still cites no authority that this conduct violated a clearly established constitutional right.

Summary judgment on Plaintiff's Third Cause of Action is appropriate and the Court accordingly GRANTS Defendants' motions for summary judgment on this cause of action.

### 2.    Unreasonable Use of Force

Plaintiff asserts that in executing the search warrant, some Defendants used unreasonable force by shoulder butting him when opening his front door and pointing a gun at his chest when he was already handcuffed and under the control of the officers. Plaintiff acknowledges, however,

16

that neither Badgley nor Massaro — the only two Defendants against whom Plaintiff brings this claim — actually engaged in any of the above-referenced conduct and agrees to dismiss this claim against them both. *See* Dkt. No. 83 at 1; Dkt. No. 96 at 6, 12–13. Based on this admission, the Court GRANTS Defendants' motions for summary judgment on Plaintiff's First Cause of Action.

### 3. False Arrest

Plaintiff's Fourth Cause of Action alleges that Badgley arrested Plaintiff without probable cause. The Court, however, finds that Badgley is entitled to qualified immunity on this claim as it was not unreasonable for Badgley to conclude under the circumstances that he had probable cause to arrest Plaintiff for violations of California Health and Safety Code §§ 11358 (cultivation of marijuana), 11359 (possession of marijuana for sale), and 11350 (possession of a controlled substance).

The Fourth Amendment requires that police officers have probable cause to support an arrest. *Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010). An arrest is supported by probable cause if, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *Luchtel*, 623 F.3d at 979. "The evidence need support 'only the probability, and not a prima facie showing, of criminal activity . . . .'" *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

According to Plaintiff, Badgley arrested Plaintiff for California Health and Safety Code violations §§ 11358, 11359, and 11350 before the officers had opened Plaintiff's safe and found the illegal prescription pills and packaged marijuana. *See* Dkt. No. 77-6 ¶¶ 16–18; Dkt. No. 84 ¶ 29. Viewing the evidence in the light most favorable to Plaintiff, the officers had still found over 70 marijuana plants, a triple beam scale, and a shotgun before Badgley arrested him. Dkt. No. 77-6 ¶ 16; *see also* Dkt. No.77-4 at BNE-0026; Dkt. No. 77-7 at BNE-0006–07. *Cf. United States v. Carrasco*, 257 F.3d 1045, 1048 (9th Cir. 2001) (noting that guns and scales are "known tools" of the drug trade).

Plaintiff's only response is that Badgley knew or should have known that Plaintiff's marijuana possession was legal under California's CUA, Cal. Health & Safety Code § 11362.5,

and Medical Marijuana Program Act ("MMPA"), Cal. Health & Safety Code §§ 11362.7–11362.9. It is undisputed that Plaintiff's physician had issued him an IMCV, permitting the cultivation of 99 marijuana plants and possession of 19 lbs. of cannabis for personal use. *See* Cal. Health & Safety Code § 11362.5; *see also* Dkt. No. 84-1. Both Plaintiff and his roommate told Badgley several times that Plaintiff had an IMCV. Dkt. No. 83-1 ¶¶ 15–17, 25; Dkt. No. 84 ¶¶ 30–32. The IMCV was also posted in the house, including near the marijuana plants. *See* Dkt. No. 84 ¶¶ 10–11.

Even if Plaintiff could legally cultivate marijuana, Plaintiff's IMCV does not dispel otherwise legitimate probable cause for an arrest or render Badgley unreasonable in concluding he had probable cause to arrest Plaintiff.

The Ninth Circuit has clarified that "[t]he existence of the Compassionate Use Act [] and the Medical Marijuana Program Act [] do not change the probable cause analysis." *United States v. Carpenter*, 461 F. App'x 539, 540 (9th Cir. 2011); *cf. Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) ("[I]nnocent explanations . . . cannot eliminate the suspicious facts from the probable cause calculus. Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior.") (arrest for being under the influence of a controlled substance).[7] The CUA is an affirmative defense at trial; it does not immunize an individual from arrest. *People v. Kelly*, 47 Cal. 4th 1008, 1013 (Cal. 2010) ("The CUA does not grant immunity from *arrest* for [possession and cultivation of marijuana].") . And the MMPA, in turn, offers limited protection from arrest for possession and cultivation. Even under the MMPA, police officers need not accept an IMCV if they have "reasonable cause" to believe it is fraudulent or is being used fraudulently. *See Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.*, 56 Cal. 4th 729, 754 n.7 (Cal. 2013); *cf. Allen v. Kumagai*, 356 F. App'x 8, 9 (9th Cir. 2009) ("[O]fficers' knowledge of [a] medical authorization may be relevant to whether they had probable cause to believe [a suspect] had committed a crime.").

Neither the CUA nor the MMPA permit a patient's *sale* of marijuana. *See People v. Joseph*, 204 Cal. App. 4th 1512, 1521 (Cal. Ct. App. 2012) ("The CUA does not authorize medical

---

[7] As an unpublished Ninth Circuit decision, *Carpenter* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

marijuana patients or their primary caregivers to engage in sales of marijuana"); *People v. Hochanadel*, 176 Cal. App. 4th 997, 1009 (Cal. Ct. App. 2009) ("The MMPA . . . specifies that [individuals,] collectives, cooperatives or other groups shall not profit from the sale of marijuana."). Accordingly, where a police officer has reason to believe that a patient does not possess or cultivate the substance for his "personal medical purposes," probable cause may still exist. *People v. Mower*, 28 Cal. 4th 457, 469 (Cal. 2002) ("Even when law enforcement officers believe that a person who 'possesses or cultivates marijuana' is a 'patient' or 'primary caregiver' acting on the 'recommendation or approval of a physician,' they may — as in this case — have reason to believe that that person does not possess or cultivate the substance 'for the personal medical purposes of the patient.'"). And even under the CUA and the MMPA, "the quantity [of marijuana] possessed by the patient or the primary caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs." *See, e.g.*, *Littlefield v. Cty. of Humboldt*, 218 Cal. App. 4th 243, 251–53 (2013) (citing *People v. Trippet*, 56 Cal. App. 4th 1532, 1538 (Cal. Ct. App. 1997), *as modified on denial of reh'g* (Sept. 9, 1997) and *People v. Kelly*, 47 Cal. 4th 1008, 1049 (Cal. 2010)). Courts have accordingly indicated that officers may consider the *amount* of marijuana as part of the probable cause analysis, notwithstanding a written recommendation from a physician. *See Littlefield*, 218 Cal. App. 4th at 253 ("[T]he sheer quantity of marijuana under cultivation could lead a reasonably prudent officer to conclude that plaintiffs' production far exceeded their medical needs.").

Here, Badgley knew from Nelsen's briefing and the contents of the search warrant that Plaintiff was being investigated as part of a larger marijuana distribution scheme with Hutson as the broker between cultivators and wholesalers. Dkt. No. 77-6 ¶¶ 9–11. In Nelsen's affidavit, attached to the warrant, he stated that he believed that Hutson "purchases and arranges for the sales of marijuana between cultivators and wholesale suppliers." Dkt. No. 77-4 at BNE-0068. Nelsen further stated in the affidavit that he knows through his training and experience that "persons who grow marijuana for profit will often use medical marijuana recommendations to help make their cultivation activity appear legitimate." *Id.* at BNE-0082. Such an operation, if true, would fall outside the boundaries of the CUA and the MMPA. Before arresting Plaintiff,

Badgley had seen the large quantity of marijuana, the triple-beam scale, and a gun. Badgley acted reasonably in concluding on the basis of these facts that there was probable cause to believe Plaintiff possessed the marijuana for sale rather than strictly for personal use.

Plaintiff urges the Court to consider Badgley's failure to comply with the California Attorney General's 2008 Guidelines for the Security and Non–Diversion of Marijuana Grown for Medical Use ("Guidelines"). *See* Dkt. No. 86-3. Yet the Guidelines merely underscore the reasonable basis for probable cause in this case. The Guidelines direct that police officers "should use their sound professional judgment to assess the validity of the person's medical-use claim" based on the totality of the circumstances, including the quantity of marijuana present and the presence of weapons. Here, Plaintiff possessed over ten times the benchmark number of mature marijuana plants that a qualified patient may possess under the MMPA. *See* Cal. Health & Safety Code § 11362.77(a)–(b). Although Plaintiff's IMCV permitted more, it also did not establish that the benchmark "does not meet [Plaintiff's] medical needs." *Id.*

In light of all the circumstances available to Badgley, the Court finds that he did not violate any clearly established law by arresting Plaintiff without a warrant. Alternatively, even if the Court were to conclude that he lacked probable cause to arrest Plaintiff, it is clear that reasonable officers could have believed that probable cause existed based on the undisputed facts. *Pearson*, 555 U.S. at 231; *Saucier*, 533 U.S. at 202. The Court accordingly GRANTS Defendants' motion for summary judgment on Plaintiff's Fourth Cause of Action.

### 4. Failure to Train and Supervise

Plaintiff's Fifth Cause of Action alleges that Humboldt County, as well as Downey and Hanson, failed to properly train and supervise the other County Defendants. Under § 1983, "a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978)). Rather, to find liability, the plaintiff must show "that a policy or custom led to the plaintiff's injury" and that "the policy or custom reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* (quotation omitted). Similarly, a supervisor is only liable in his individual capacity "for his own

United States District Court
Northern District of California

culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009). At a minimum, Plaintiff must allege a "factual basis for imputing . . . knowledge" of subordinates' unconstitutional practices as well as culpable action or inaction. *Chavez v. United States*, 683 F.3d 1102, 1111 (9th Cir. 2012).

Here, Plaintiff has failed to identify any Humboldt County policy or custom that caused Plaintiff's alleged injury. Plaintiff has also failed to identify any factual basis for imputing knowledge of County Defendant's wrongful conduct, even assuming they engaged in any. The Court further notes that Plaintiff appears to have abandoned this claim by failing to defend it in his opposition to the motion for summary judgment. *See Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). The Court accordingly GRANTS Defendants' motion for summary judgment on the Fifth Cause of Action.

### B. State Law Claims

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The Court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 561 (quotation omitted).

The Court has granted summary judgment in favor of Defendants on Plaintiff's federal claims, and all that remain are the state law claims over which the Court lacks original jurisdiction. *See* Dkt. No. 69 ¶¶ 98–140 (alleging claims for assault and battery; conversion; false arrest and imprisonment; failure to properly train and supervise; defamation; intentional infliction of emotional distress; and negligent infliction of emotional distress). Having considered the *Sanford* factors, the Court declines to assert supplemental jurisdiction over these purely state law claims and instead remands to state court. *See* 28 U.S.C. § 1367(c)(3); *Sanford*, 625 F.3d at 561 (holding

that district court acted within its discretion in declining to exercise supplemental jurisdiction over pendent state law claims after granting motion to dismiss all federal claims).

The Court further notes that the remaining claims involve complex issues of state law regarding the application of immunity under California Government Code § 821.6. 28 U.S.C. § 1367(c)(1). This section grants immunity to any "public employee . . . for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov't Code § 821.6. Federal courts have interpreted the scope of this immunity differently. The Ninth Circuit suggested in *Blankenhorn v. City of Orange* that § 821.6 "extends to actions taken in preparation for formal proceedings, including actions incidental to the investigation of crimes." 485 F.3d 463, 488 (9th Cir. 2007) (citing *Amylou R. v. County of Riverside*, 28 Cal. App. 4th 1205 (1994)); *see also Chaudhry v. City of Los Angeles*, 573 F. App'x 628, 633 (9th Cir. 2014) (finding police officers immune under § 821.6 for conversion claim based on retaining property as part of investigation into a shooting); *Mackovski v. City of Garden Grove*, 666 F. App'x 649, 655 (9th Cir. 2016) (same). Yet in *Garmon v. Los Angeles*, the Ninth Circuit explicitly held that the California Supreme Court would only apply § 821.6 narrowly to malicious prosecution claims. 828 F.3d 837, 847 (9th Cir. 2016). To date, no case has harmonized these two holdings. Given the ambiguity in the case law, the values of economy, convenience, fairness, and comity will be best served by allowing California courts to decide these state law claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED IN PART as follows:

1. GRANTED on Plaintiff's Fourth Amendment claims of excessive force against Badgley and Massaro (First Cause of Action);

2. GRANTED on Plaintiff's Fourth Amendment claims of unreasonable search and seizure in obtaining a warrant against Nelsen (Second Cause of Action);

3. GRANTED on Plaintiff's Fourth Amendment claims of unreasonable search and seizure against Badgley, Harkness, Kirkpatrick, Hanson, Musson, Quennell, and Massaro (Third

Cause of Action);

       4.     GRANTED on Plaintiff's Fourth Amendment claim of warrantless arrest without probable cause against Badgley (Fourth Cause of Action);

       5.     GRANTED on Plaintiff's Fourth Amendment claim against Humboldt County, Downey, and Hanson (Fifth Cause of Action);

       Because the Court grants summary judgment as to all Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction and hereby REMANDS Plaintiff's remaining state law causes of action to Humboldt County Superior Court. The clerk is directed to enter judgment accordingly, remand the remaining state claims to Humboldt County Superior Court, case no. DR150282, and close the case.

       **IT IS SO ORDERED.**

Dated:   5/19/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge